## United States District Court
## District of Massachusetts

```
                              )
DUNKIN' DONUTS FRANCHISED     )
RESTAURANTS LLC and DD IP HOLDER )
LLC,                          )
                              )
         Plaintiffs,          )      Civil Action No.
                              )      14-10162-NMG
         v.                   )
                              )
WOMETCO DONAS INC. and WOMETCO )
DE PUERTO RICO, INC.,         )
                              )
         Defendants.          )
                              )
```

### MEMORANDUM & ORDER

**GORTON, J.**

This case involves claims of breach of contract, trademark infringement, unfair competition and trade dress infringement by Dunkin' Donuts Franchised Restaurants LLC and DD IP Holder LLC (collectively, "plaintiffs" or "Dunkin'") against Wometco Donas Inc. ("Wometco Donas") and Wometco de Puerto Rico ("Wometco PR") (collectively, "defendants") to prevent the continued operation without permission of 18 Dunkin' franchises in Puerto Rico. Pending before the Court is 1) plaintiffs' motion for a preliminary injunction to enjoin defendants from continuing to infringe Dunkin's trademarks, 2) plaintiffs' motion for leave to file an amended complaint and 3) plaintiffs' motion to enjoin Wometco PR from prosecuting a related action.

The crux of the issue before the Court is defendants'
failure to pay approximately $196,000 in royalty and renewal
fees.  Plaintiffs claim that those payments are owed under the
Multiple Unit Development and Franchise Agreement ("the
Franchise Agreement") signed by Dunkin' and Wometco Donas in
2001 and, therefore, seek to terminate the agreement for
defendants' failure to pay.  Defendants admit that they owe
royalties but contend that no renewal fees are owed because the
Franchise Agreement is not the operative contract between the
parties.  Instead, defendants contend that, despite the
existence of the signed Franchise Agreement, Wometco PR, not
Wometco Donas, actually operates the Dunkin' franchises in
Puerto Rico pursuant to an unspecified oral agreement negotiated
"some time before 2001."  According to defendants, Dunkin's
termination of defendants' franchising arrangement is therefore
without just cause and violates the Puerto Rico Dealer's Act.

For the reasons that follow, the Court will allow
plaintiffs' motion and enter a preliminary injunction against
defendants.  The Court finds that defendants are in breach of
their contractual obligations and plaintiffs have, therefore,
met their burden of proving a likelihood of success on the
merits.  The Court also finds that plaintiffs have made the
required showings with respect to irreparable harm, the balance
of equities and the public interest.

In addition, because of the substantial overlap between this action and the subsequently filed case in the District of Puerto Rico, the Court will allow Dunkin's motion to enjoin Wometco PR from prosecuting its duplicative action in that court.[1]

I.   **Background**

    A.   **The Parties**

Plaintiffs are Delaware limited liability companies with their principal place of business in Canton, Massachusetts. Dunkin' is the franchisor of the Dunkin' Donuts System which involves the production, merchandising and sale of doughnuts and related products.  Dunkin' owns the trademarks and licenses others to use them and the Dunkin' Donuts trade name.

Defendants Wometco Donas and Wometco PR are both Puerto Rico corporations with their principal places of business in Santurce, Puerto Rico and Guaynabo, Puerto Rico respectively. Under the Franchise Agreement and its addenda, Wometco Donas operates 18 Dunkin' Donuts shops throughout Puerto Rico and its obligations are guaranteed by Wometco PR.  Michael S. Brown ("Brown") is the president of both companies.

---

[1] Dunkin' has also filed a motion for leave to file an amended complaint which, despite defendants' opposition, the Court will allow.

## B. Factual Background

On February 26, 2001, the Franchise Agreement was signed by a Dunkin' Donuts representative and Brown on behalf of Wometco Donas. It authorized Wometco Donas to use Dunkin' trademarks, trade names and trade dress in the operation of its franchises in Puerto Rico.

In addition to an initial franchise fee of $25,000 per shop, Wometco Donas agreed to pay Dunkin' a royalty of 5% of each shop's gross monthly sales. The Franchise Agreement provided for an initial term of ten years, after which

> if exercised by [Wometco Donas], for any Shop, [Dunkin' Donuts] shall grant to [Wometco Donas] one ten (10) year extended term or renewal for each Shop automatically upon the receipt of payment by [Dunkin' Donuts] from [Wometco Donas] of a renewal fee in an amount equal to...Twelve Thousand and Five Hundred Dollars (US$12,500) for each [Shop].

The Franchise Agreement noted that in the event of a material default by Wometco Donas, Dunkin' could terminate the agreement contingent upon a 30-day notice to cure. It also provided that Wometco Donas was entitled to a ten-day period to cure a failure to pay any amounts due. The Franchise Agreement states that it shall be governed by Massachusetts law.

Exhibit E of the Franchise Agreement was a Guarantee by Wometco PR for

> full payment and performance of [Wometco Donas's] obligations under the Franchise Agreement from each Guarantor's own debt.

-4-

The Franchise Agreement was amended in November, 2002 ("the 2002 Amendment"), to reflect Wometco Donas' purchase of the rights to three Dunkin' shops from CADI Foods, Inc. The 2002 Amendment was signed by a Dunkin' representative and Brown on behalf of Wometco Donas.

The Franchise Agreement was again amended in July, 2011 ("the 2011 Amendment") to reflect Wometco Donas' noncompliance with the terms of the Franchise Agreement due to its

> limited access to working capital [and its inability to] undertake additional development in the near future.

In general, the 2011 Amendment allowed Wometco Donas to seek third party investment and possible assignment agreements with respect to its franchise operations. It noted that Wometco Donas had "developed and operated a number of Shops in [Puerto Rico] since 2001."

The 2011 Amendment also replaced the previous provision with respect to renewal of the Franchise Agreement with the following language:

> Except as otherwise provided herein, the initial term of this Agreement shall expire with respect to a Shop opened hereunder ten (10) years from the opening of such Shop. Upon expiration of the initial term and with the prior written approval of [Dunkin' Donuts], [Wometco Donas] shall have the right to renew the term for a Shop for ten (10) additional years for a renewal fee of (a) US$12,500 for each [Shop] or (b) US$6,250 for each Kiosk.

The 2011 Amendment was signed by a Dunkin' representative and Brown on behalf of Wometco Donas.

In March, 2013, 10 of defendants' 18 shops came up for renewal under the terms of the Franchise Agreement resulting in renewal fees of $125,000 due to Dunkin'. Defendants continued to operate the ten shops but did not pay the renewal fees.

On January 7, 2014, Dunkin' served defendants with a notice of default/notice to cure, advising them that they had 10 days in which to pay outstanding royalty fees of $58,483, renewal fees of $125,000 and interest of $12,502. Defendants failed to cure the default and Dunkin' terminated the Franchise Agreement pursuant to a notice of termination dated January 22, 2014. Defendants have refused to accept termination and are continuing to operate the subject franchises and use Dunkin's trademarks, trade names and trade dress without license.

Notwithstanding Dunkin's termination, the parties stated at oral argument that defendants

> could continue to operate [and that Dunkin'] would honor [its] obligations [pending] judicial ratification of that termination.

Dunkin' indicated that it has "done nothing to force [defendants'] operations to shut down in any way, shape or form."

**C.   Procedural History**

On January 23, 2014, plaintiffs filed a complaint in this
Court alleging breach of contract (Count I), trademark
infringement (Count II), unfair competition (Count III) and
trade dress infringement (Count IV).  On March 5, 2014,
plaintiffs filed a motion for a preliminary injunction against
Wometco Donas and Wometco PR.

This Court held a hearing on the subject motion on March
27, 2014.  The following day, in light of the parties'
representations with respect to possible settlement, the Court
directed the parties to submit a status report to the Court with
respect to their negotiations on or before April 3, 2014.  The
parties subsequently moved jointly to stay the action, pursuant
to which the case was stayed for four weeks.  On April 28, 2014,
the parties submitted separate status reports indicating that
they had been unable to reach a settlement.

In a related development, on March 5, 2014, Wometco PR
filed a separate complaint in the District of Puerto Rico
against Dunkin', alleging a violation of the Puerto Rico Dealers
Act for termination without "just cause" and tortious
interference by Dunkin'.  The complaint also names Baskin-
Robbins Franchising LLC ("Baskin-Robbins"), the brand of which
is owned by Dunkin' and whose stores are often co-located with
Dunkin' shops in Puerto Rico.

In the Puerto Rico action, Wometco PR seeks $18 million in damages, a declaration that the Franchise Agreement is null and void and inapplicable to Wometco PR and injunctive relief barring arbitration of the dispute under the Franchise Agreement. On April 3, 2014, Dunkin' and Baskin Robbins filed a motion to dismiss, transfer or stay that case. The parties filed memoranda with respect to that motion but it remains pending before the Puerto Rico Court.

In this action, Dunkin' filed a motion for leave to file an amended complaint on May 23, 2014, seeking to add claims against defendants for money damages and a declaratory judgment. One week later, Dunkin' filed a motion to enjoin Wometco PR from prosecuting its case in the District of Puerto Rico. Defendants have opposed both motions.

## II. <u>Dunkin's Motion for a Preliminary Injunction</u>

Plaintiffs claim that defendants failed to pay the renewal fees yet continue to use Dunkin's trademarks without license and should therefore be enjoined from doing so.[2] Defendants do not dispute their continued use of Dunkin' trademarks but, instead, assert that such use is permitted because the license was terminated without "just cause." Accordingly, the Court need

---

[2] Although plaintiffs allege in their complaint that defendants have failed to make royalty payments, the parties acknowledged at oral argument that royalties were no longer at issue and, accordingly, the Court will limit its analysis to the issue of the renewal fees.

not address whether defendants continued use infringes because that is admitted for present purposes.

Defendants contend that they are no longer obligated to pay renewal fees because Wometco Donas' agreement with Dunkin' is void and a provision with respect to renewal fees was never included in Wometco PR's oral agreement with Dunkin'. Defendants assert that, although Dunkin' and Wometco Donas entered into an explicit license agreement in 2001 which was subsequently amended in 2002 and 2011, that agreement was "never put into effect." Instead, defendants purport that Dunkin' entered into a separate, oral agreement with Wometco PR, not Wometco Donas, prior to the license agreement pursuant to which Wometco PR has operated the Dunkin' franchises in Puerto Rico for the past 13 years. Accordingly, defendants claim that the obligation to pay renewal fees

> has been fabricated or unilaterally imposed by
> Plaintiffs to harass Wometco PR and to use as a
> pretext to try to terminate the relationship.

In response, plaintiffs aver that no credible evidence exists to support defendants' version of the facts. Moreover, plaintiffs note that Wometco Donas and Wometco PR appear to have the same ownership and leadership, thus contradicting defendants' claim that Wometco Donas is "not involved in the operation of Wometco PR's stores." Finally, plaintiffs underscore that the original written agreement included an

-9-

express integration clause and was subsequently amended by written agreements signed by representatives of Dunkin' and Wometco Donas in November, 2002, and July, 2011, with Brown acting as the representative of Wometco Donas on both occasions.

## A. Legal Standard

Under the familiar standard, a movant seeking a preliminary injunction must demonstrate that he

> is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). Even with this standard, "[a] preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." Voice of the Arab World, 645 F.3d at 32 (quoting Munaf v. Green, 553 U.S. 674, 689-90 (2008)). An "injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). At bottom, however, "[l]ikelihood of success is the main bearing wall of the four-factor framework." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).

**B. Analysis**

    **1. Likelihood of Success on the Merits**

        **a. Legal Standard**

The first factor to consider in granting a preliminary injunction is whether the movant is likely to succeed on the merits. <u>Voice of the Arab World</u>, 645 F.3d at 32. Although it is only the first of four factors, the likelihood of success on the merits inquiry is the most significant. Indeed, "whether the plaintiffs are likely to succeed on the merits" is the "<u>sine qua non</u>" of the test for a preliminary injunction. <u>Weaver</u> v. <u>Henderson</u>, 984 F.2d 11, 12 (1st Cir. 1993). "In the ordinary course, plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will not obtain interim injunctive relief." <u>Id.</u>

        **b. Application**

           **i. Determining the Applicable Contract**

The Court must first determine what agreement governs the parties' contractual relationship. Plaintiffs argue that the Franchise Agreement signed by Dunkin' and Wometco Donas in 2001 is the operable agreement with respect to the Dunkin' franchises in Puerto Rico. Defendants contend that the oral agreement between Dunkin' Donuts and Wometco PR from before 2001 controls.

At this stage, the available evidence and common sense lead to the conclusion that the written Franchise Agreement governs

the parties' contractual relationship.  First, while plaintiffs
have submitted the written license agreement to the Court,
defendants have simply proffered an affidavit of Brown claiming
that an oral contract was formed.  Absent from Brown's
description, however, is any detail with respect to when the
parties negotiated that agreement or what terms it included.  He
simply asserts that

> some time before 2001...individuals affiliated with
> [Dunkin' Donuts] approached Wometco PR to offer it the
> Puerto Rico dealership of Dunkin' Donuts products...
> [and] Wometco PR accepted the offer.

Second, the inherent unlikelihood of defendants' position
gives the Court pause.  Defendants would have the Court believe
that although Dunkin' had just reached an oral agreement with
Wometco PR to operate its franchises in Puerto Rico in 2001, it
nonetheless subsequently drafted and executed a superfluous 27-
page Multiple Unit Development and Franchise Agreement
containing six exhibits with Wometco Donas.  Such alleged
conduct is simply not credible.

Accordingly, the Court finds that plaintiffs are likely to
prove that the Franchise Agreement between Dunkin' Donuts and
Wometco Donas governs the franchises operated by defendants in
Puerto Rico.

### ii. "Just Cause" under Law 75

The second question before the Court is whether plaintiffs'
decision to terminate the Franchise Agreement violated the
Puerto Rico Dealer's Act. See Law 75 of June 24, 1964, 10 P.R.
Laws. Ann. §§ 278-278d. The statute, known as Law 75, prohibits
a supplier from "directly or indirectly perform[ing] any act
detrimental to the established relationship...except for just
cause." Id. § 278a. It defines "just cause" as

> [n]onperformance of any of the essential obligations
> of the dealer's contract, on the part of the dealer,
> or any act or omission on his part that adversely and
> substantially affects the interests of the principal
> or grantor in promoting the marketing or distribution
> of the merchandise or service.

10 P.R. Laws Ann. § 278(d) (emphasis added). Law 75 is intended
to prevent the "abusive practices of suppliers who arbitrarily"
terminate distribution agreements after substantial investment
and the establishment of a market in Puerto Rico for the
supplier's products. Triangle Trading Co. v. Robroy Indus.,
Inc., 200 F.3d 1, 2 (1st Cir. 1999).

Defendants' argument is simply that because the purported
oral agreement between Dunkin' Donuts and Wometco PR did not
include a provision for renewal fees after 10 years, plaintiffs
cannot terminate the contract based on a failure to pay such
fees. Indeed, defendants breathlessly note that Dunkin'
"orchestrated a scheme to destroy Wometco PR's four-decade

operation on [Puerto Rico]." Plaintiffs respond that the written Franchise Agreement expressly includes such renewal fees and defendants' failure to pay them constitutes a material breach of an essential obligation of the contract.

Thus, the parties appear to acknowledge that the crucial question is which of two allegedly conflicting contracts is to be enforced. Because the Court has already determined that the written Franchise Agreement governs the contractual relationship between the parties, defendants' failure to pay the renewal fees constitutes a breach of that contract.

Defendants argue in the alternative, however, that even if the written Franchise Agreement were applicable, plaintiffs waived their right to collect renewal fees because Dunkin' "had already 'renewed' Wometco PR's right for each of the 10 stores in question." For support of that argument they cite only a conclusory statement in Brown's affidavit that does not address whether plaintiffs had renewed the franchise agreement. The Court need not linger over that contention and it is rejected summarily.

Defendants also appear to assert that Dunkin' has waived any requirement of timely payment. Plaintiffs vigorously dispute that argument, noting that they have never acquiesced to late payments and, even assuming they had, isolated acceptance

of late payments does not constitute a waiver of an express provision requiring timely payments.

The First Circuit has held that timely payment for goods or services "normally is one of the essential obligations of the dealer's contract" under Law 75. PPM Chem. Corp. of Puerto Rico v. Saskatoon Chem. Ltd., 931 F.2d 138, 139 (1st Cir. 1991). The First Circuit has also "recognized an exception in those unusual cases where 'a supplier does not care about late payments.'" Waterproofing Sys., Inc. v. Hydro-Stop, Inc., 440 F.3d 24, 29 (1st Cir. 2006) (quoting PPM Chem. Corp., 931 F.2d at 139). Proof that a supplier has waived such a provision, however, must meet a high burden. Simply because late payments were at one point accepted or due balances had accumulated does not, without more, constitute waiver. See Tatan Mgmt. v. Jacfran Corp., 270 F. Supp. 2d 197, 201-02 (D.P.R. 2003) ("That [the supplier] tolerated due balances and attempted to resolve the dispute amicably through reasonable payment plans does not mean that they altered the terms and somehow excused [the distributor's] timely performance, however.").

Here, defendants have failed to show that Dunkin' "does not care about late payments." Indeed, as plaintiffs emphasize, defendants have not described a single instance where Dunkin' acquiesced to a late payment. Moreover, even if isolated late payments were accepted, Law 75 does not require suppliers

-15-

strictly to observe payment schedules in all instances "or risk being forever banned" from terminating on the basis of failure to pay. Waterproofing, 440 F.3d 29-30; see also Casco Sales Co. Inc. v. Maruyama U.S., Inc., 901 F. Supp. 2d 311, 320-21 (D.P.R. 2012) (distinguishing acceptance of late payments from "acquiescence" to such payments).

In essence, Law 75 is "not intended to extend unworkable relationships, but only to prevent arbitrary terminations." R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 485 (1st Cir. 1994). Therefore, the Court finds that plaintiffs are likely to prove that they had "just cause" to terminate the franchise agreement and that defendants cannot invoke Law 75's protection in this case.

### 2. Irreparable Harm

#### a. Legal Standard

The second factor to evaluate in considering a preliminary injunction is whether the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief. Voice of the Arab World, 645 F.3d at 32 (citation omitted). No "mechanical test" exists to calculate "the quantum of hard-to-measure harm that will suffice to justify interim injunctive relief." Ross-Simons of Warwick, 102 F.2d at 19. It normally suffices, however, if the movant demonstrates "that its legal remedies are inadequate" and it faces "a substantial injury that

-16-

is not accurately measureable or adequately compensable by money

damages." Id. at 18-19 (citation omitted).  Examples of

irreparable injuries include loss of incalculable revenue and

harm to goodwill or reputation. Id. at 19-20.

In the preliminary injunction context, the First Circuit

also measures irreparable harm

> on a sliding scale, working in conjunction with a
> moving party's likelihood of success on the merits,
> such that the strength of the showing necessary on
> irreparable harm depends in part on the degree of
> likelihood of success shown.

Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d

36, 42-43 (1st Cir. 2010).

Although the First Circuit has long employed a presumption

of irreparable harm in infringement claims, see Concrete Mach.

Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611

(1st Cir. 1988), the Supreme Court has called that presumption

into question in a recent case involving claims of patent

infringement. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388,

393 (2006).  Noting the generally applicable language of the

Supreme Court's admonition, the First Circuit subsequently found

"no principled reason why it should not apply" in the context of

a preliminary injunction to halt trademark infringement. Voice

of the Arab World, 645 F.3d at 33.  Because of its ultimate

holding, however, the First Circuit did not decide the issue in

Voice of the Arab World. Id. at 34-35.

In subsequent cases, moreover, the First Circuit has again noted this observation but still refused to decide whether eBay's holding extends to trademark infringement cases. See Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d 44, 54-55 (1st Cir. 2013) (reversing the district court's grant of an injunction "[w]hether or not the presumption of irreparable harm remains viable in this context"). Other courts, however, have held that eBay's holding extends to other fields of intellectual property law. See, e.g., Salinger v. Colting, 607 F.3d 68, 77-78 (2d Cir. 2010).

Accordingly, this Court can comfortably extend the holding of eBay v. MercExchange to this case.

### b. Application

Plaintiffs contend that they will suffer irreparable harm in the absence of preliminary injunctive relief because Dunkin' Donuts' customers are being deceived and Dunkin' Donuts has lost the ability to ensure the quality of the products offered under its trademarks. Plaintiffs emphasize that neither harm is quantifiable. Moreover, they note that courts have historically found that irreparable injury can be presumed from a showing of likelihood of success on the merits in a trademark infringement case.

Defendants respond that the presumption of irreparable harm in cases of trademark infringement has been functionally

abolished in the First Circuit and should not apply here. Furthermore, defendants claim that they are continuing to follow Dunkin' Donuts' quality control guidelines so that there is no decrease in quality to Dunkin' Donuts' customers. Indeed, defendants note that, "if anything, Dunkin' and its goodwill continue to benefit from the continued operations by Wometco PR."

With a presumption of irreparable harm in place in trademark infringement cases, the Court can apply that presumption to the present facts. Moreover, applying the First Circuit's "sliding scale," the strong showing of a likelihood of success on the merits relaxes the requirement of irreparable harm. Thus framed, it is a simple task to find plaintiffs are likely to demonstrate irreparable harm in this case because they have undoubtedly lost control over their trademark in Puerto Rico.

### 3. Balance of Equities and the Public Interest

#### a. Legal Standard

The third and fourth factors to evaluate in connection with a motion for preliminary injunction are whether such relief would comport with the balance of the equities in the case and be in the public interest.

The Court must balance "the hardship that will befall the nonmovant if the injunction issues . . . with the hardship that

will befall the movant if the injunction does not issue." Mercado-Salinas v. Bart Enter. Intern., Ltd., 671 F.3d 12, 19 (1st Cir. 2011) (citation omitted).  The potential of lost profits alone does not constitute sufficient hardship for this inquiry. See Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612 (1st Cir. 1988).

A preliminary injunction must also be in the public interest. Voice of the Arab World, Inc., 645 F.3d at 32 (citation omitted). "The public interest that is referred to in the test [is] the public's interest in the issuance of the injunction itself." Braintree Labs., 622 F.3d at 45 n.8.  If there is no measurable effect on the public interest, the Court relies more heavily on the other criteria. See Ross-Simons of Warwick, 102 F.3d at 15 (reviewing "the effect, if any, on the public interest") (emphasis added).

### b.  Application

The balance of the equities and the public interest in this case weighs, albeit moderately, in plaintiffs' favor.  While defendants should not be rewarded for their seemingly bald-faced refusal to pay renewal fees, the record also indicates that a preliminary injunction would likely result in the closure of many, if not all, of the Dunkin' Donuts franchises in Puerto Rico.  The current plight of the Puerto Rican economy is well-known to this Court (and described by defendants in their

submissions) but the possibility of some adverse effects cannot, without more, protect defendants from the consequences of their actions.  Accordingly, the Court finds that the balance of the equities and the public interest favor granting a preliminary injunction in this case.

### 4. Conclusion

Therefore, the Court finds that Dunkin' has met its burden and will allow plaintiffs' motion for a preliminary injunction.

## III. <u>Dunkin's Motion to Enjoin Wometco PR</u>

The Court turns to the question of whether it should assume sole jurisdiction over the present dispute after Dunkin' filed a motion to enjoin Wometco PR from prosecuting its case against Baskin-Robbins and Dunkin' in the District of Puerto Rico, <u>Wometco de Puerto Rico, Inc.</u> v. <u>Baskin-Robbins Franchising LLC et al.</u>, 14-cv-01172-CCC.

Dunkin' contends that Wometco PR, one of the two defendants in this case, should be enjoined from litigating against Dunkin' and Baskin-Robbins in the Puerto Rico case because the facts in dispute in this action and in the Puerto Rico case are "identical."  Dunkin' notes that Wometco PR's Puerto Rico case was filed one month after Dunkin' initiated the subject case and was a blatant attempt to forum shop and avoid this Court's jurisdiction.  Moreover, Dunkin' asserts that no special

circumstances warrant circumventing the traditional first-to-file rule in this case.

Defendants respond that the two cases are not, in fact, identical and, even if the Court finds them to be, special circumstances should lead the Court to deny the motion and allow the case to proceed in Puerto Rico.  Finally, defendants emphasize that the 2014 Puerto Rico case is actually an extension of a case filed in 2012 that concerned the same subject matter and was dismissed without prejudice only for the purpose of attempting to negotiate a settlement of the instant dispute. See Wometco de Puerto Rico, Inc. v. Baskin-Robbins Franchising LLC, 12-cv-01647-JAG.

The Court finds that the two cases are substantially similar and share a common nucleus of operative facts. The subject action was filed first and no special circumstances justify upsetting the first-to-file rule.  Accordingly, the Court will allow Dunkin's motion and enjoin further prosecution of the Puerto Rico case during the pendency of this action.

### A.  Legal Standard

Because parallel federal suits are disfavored, the court where a first-filed action occurs

> has the power to enjoin the parties from proceeding in the second action, and indeed, should do so absent a showing of special circumstances that would give priority to the second action.

Toy Biz, Inc. v. Centuri Corp., 990 F. Supp. 328, 332 (S.D.N.Y. 1998); see also United Fruit Co. v. Standard Fruit & S.S. Co., 282 F. Supp. 338, 340 (D. Mass. 1968) ("The issuance or denial of an injunction against proceedings in a subsequent action in a district court is not mandatory but discretionary.").

Such cases need not be literally identical; it suffices if they are substantially similar. Wiley v. Gerber Prods. Co., 667 F. Supp. 2d 171, 173 n.1 (D. Mass. 2009); see also Catanese v. Unilever, 774 F. Supp. 2d 684, 689 (D.N.J. 2011) (holding that "exact identity of claims is not required"). Similarity is determined as it is in consolidating cases and changing venue, based on considerations of "the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." TPM Holdings, Inc. v. Intra-Gold Indus., Inc., 91 F.3d 1, 4 (1st Cir. 1996).

Once a court finds that the second-filed case duplicates the effort of the initial complaint, it must determine whether any special circumstances warrant deviating from the first-to-file rule. Holmes Grp., Inc. v. Hamilton Beach/Procter Silex, Inc. 249 F. Supp. 2d 12, 15-16 (D. Mass. 2002). A special circumstance exists when one party

> has won the race to the courthouse by misleading his
> opponent into staying his hand in anticipation of
> negotiation or by reacting to notice of imminent
> filing by literally sprinting to the courthouse the
> same day.

-23-

TransCanada Power Mktg., Ltd. v. Narragansett Elec. Co.,402 F.

Supp. 2d 343, 348 (D. Mass. 2005) (citation omitted).

A special circumstance also exists when the forum of the

subsequently filed case is "substantially more convenient" than

the forum of the first-filed case. Holmes Grp., Inc. v. Hamilton

Beach/Procter Silex, Inc. 249 F. Supp. 2d 12, 16 (D. Mass.

2002). Assessing convenience consists of weighing

> (1) the plaintiff's choice of forum, (2) the relative
> convenience of the parties, (3) the convenience of the
> witnesses and location of documents, (4) any
> connection between the forum and the issues, (5) the
> law to be applied and (6) the state or public
> interests at stake.

Id. at 17 (citation omitted).

**B.  Application**

Although the two cases are not identical, resolving the

claims of Dunkin' in the subject action and those of Wometco PR

in the Puerto Rico case will require two courts to determine the

same legal issues. In the Puerto Rico case, defendants note

that the action

> stems from [Dunkin's] unjustified termination and
> impairment of Wometco PR's dealership relationship, in
> violation of [Law 75].

In that case, whether Dunkin's termination of the relationship

was for "just cause" is a central issue. So too here.

Moreover, the question of whether the 2001 agreement and

its amendments govern the relationship between Dunkin' and

-24-

Wometco PR and Wometco Donas appears to be dispositive in both cases. Defendants' attempt to distinguish the cases by claiming that the Massachusetts case deals with a <u>written</u> agreement while the Puerto Rico case deals with an <u>oral</u> agreement is specious. The Court finds that the two cases are substantially similar.

The Court also finds no "special circumstances" caution against applying the first-to-file rule. A brief perusal of the record in this case yields no evidence that Dunkin' "raced" to the courthouse. Indeed, it appears in a rather orderly fashion to have first issued notice to defendants with respect to their past-due obligations under the operative contract and only to have initiated litigation after being stymied in its collection effort.

The parties argue extensively over the balance of convenience in this case but the Court finds no compelling evidence that a trial in Puerto Rico would be more convenient. As both parties concede, one of them will be inconvenienced by the "common hardships associated with civil litigation" regardless of the location's proceeding. See <u>Veryfine Prods., Inc.</u> v. <u>Phlo Corp.</u>, 124 F. Supp. 2d 16, 26 (D. Mass. 2000) (finding that the "relative convenience of an alternative forum is negligible" because the case is "primarily a contract claim"). While there is undoubtedly a strong connection between Puerto Rico and the subject action, there is also a strong

-25-

connection with Massachusetts because of Dunkin's operations in this district.  While Law 75 is not regularly interpreted in Massachusetts courtrooms, Puerto Rico courts have held that other jurisdictions "are fully capable of resolving claims brought under [it]." BMJ Foods P.R., Inc. v. Metromedia Steakhouses Co., L.P., 562 F. Supp. 2d 229, 234 (D.P.R. 2008).

Finally, the Court rejects defendants' contention that the case it filed in the District of Puerto Rico is a "continuation" of its earlier-filed 2012 case.  That case addressed whether Wometco PR was required to secure third-party capital to abide by a 2009 contract with Baskin-Robbins.  To be sure, it touched upon similar issues as are present in this case but it involved a different contract.  Moreover, the Court is unconvinced that the circumstances of defendants' dismissal of that case without prejudice necessarily imply that the 2014 Puerto Rico case should be considered a "continuation" of the earlier action.

Accordingly, the Court finds that the presumption of the first-to-file rule and the absence of any special circumstances to the contrary warrant prosecution of the subject case in the District of Massachusetts and enjoining further prosecution of the case in the District of Puerto Rico.

**ORDER**

For the foregoing reasons, Dunkin' Donuts' motion for a preliminary injunction (Docket No. 13) is **ALLOWED,** Dunkin' Donuts' motion for leave to file an amended complaint (Docket No. 39) is **ALLOWED** and Dunkin' Donuts' motion to enjoin Wometco de Puerto Rico from prosecuting a duplicative action in the District of Puerto Rico (Docket No. 40) is **ALLOWED.**

**PRELIMINARY INJUNCTION**

It is hereby **ORDERED, ADJUDGED AND DECREED** that, beginning from the date of this order until the conclusion of the trial in this action, unless otherwise ordered by the Court:

1.    Wometco de Puerto Rico and Wometco Donas and all those acting in concert with them or under their direction or control:

    a) are enjoined from using, displaying or otherwise infringing upon the trademarks, trade name and trade dress of Dunkin' Donuts and from committing acts of infringement and unfair competition against Dunkin' Donuts in violation of the Lanham Act,

    b) shall cease all infringing activities by no later than 12:00 P.M. on Friday, September 26, 2014, and

    c) shall immediately comply with all of their post-termination obligations under the 2001 Multiple Unit Development and Franchise Agreement and its 2003 and 2011 amendments;

2.    Wometco de Puerto Rico and Wometco Donas shall file with this Court and serve upon Dunkin' Donuts on or before Friday, October 10, 2014, a report in writing

setting forth the manner and form in which they have
complied with the injunction;

3.    Pursuant to Fed. R. Civ. P. 65(c), Dunkin' Donuts
shall post a security bond in the amount of Two
Hundred Fifty Thousand Dollars ($250,000) as soon as
reasonably practicable after entry of this Order but
in any event no later than close of business Friday,
September 19, 2014; and

4.    Wometco de Puerto Rico is enjoined from further
prosecution of Civil Action No. 14-cv-01172-CCC in the
United States District Court for the District of
Puerto Rico without a further order from this Court.

**So ordered.**

/s/ Nathaniel M. Gorton____
Nathaniel M. Gorton
United States District Judge

Dated September 11, 2014